UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN R. WHINFIELD<br><br>     Plaintiff,<br><br>     v.<br><br>CAPITAS DISTRIBUTORS, INC.,<br>CAPITAS FINANCIAL, INC., and<br>CAPITAS AGENCY, LLC<br><br>     Defendants. | No. 3:12-CV-00812 (MPS) |

**MEMORANDUM OF DECISION**

Plaintiff John Whinfield alleges that Defendant Capitas Distributors, Inc. ("CDI"), a life insurance distribution company, breached an employment agreement with Whinfield by failing to pay commissions arising from Whinfield's sales of two life insurance policies. CDI has a brought a counterclaim against Whinfield, asserting that he owes it employment-related expenses.[1]

The Court held a two-day bench trial on May 14 and 15, 2015, and now sets forth its findings of fact and conclusions of law, Fed. R. Civ. P. 52(a)(1), which can be summarized as follows: CDI breached both its written SVP Agreement with Whinfield concerning override commissions and the parties' separate contract concerning base commissions. The override commissions due to Whinfield, however, must be reduced to account for a processing fee, as well as the other expenses he owes CDI, which means that, on a net basis, CDI owes Whinfield

---

[1] Whinfield earlier asserted other claims against CDI's related entities and with respect to another transaction, but those claims, as well as other claims for equitable and declaratory relief, have either been abandoned or dismissed in earlier rulings. The remaining claims are set forth in Counts One and Five of Whinfield's Amended Complaint (ECF No. 52), and in CDI's Counterclaim (ECF No. 68).

$48,211.90 in override commissions on the two life insurance policies and $52,689.75 in base

commissions on the Lenoci Sr. policy—for a total liability of $100,901.65. Finally, the Court

finds that CDI did not act in bad faith, arbitrarily, or unreasonably in breaching its contracts with

Whinfield, and therefore declines to award Whinfield double damages or attorneys' fees under

Conn. Gen. Stat. § 31-72. The Court enters judgment in favor of the Plaintiff in the amount of

$100,901.65.

## I.    FINDINGS OF FACT

The Court makes the following findings of fact based on witness testimony (including

deposition testimony read during the trial), trial exhibits, and the stipulation of facts ("SOF")

submitted with the parties' joint trial memorandum ("JTM"). [2]

### A.  The Parties

In 1978, John Whinfield began a career in selling life insurance with The Hartford

Financial Services Group, Inc. ("The Hartford"). Starting as a sales representative selling

through local agencies, he rose through the ranks to become the manager of a highly successful

branch office, supervising sales staff and making his own sales of large life insurance policies.

He obtained various licenses to sell regulated life insurance products, including variable life

insurance policies, which invest the cash value of the policies in securities and are themselves

considered "securities" regulated by the Securities & Exchange Commission ("SEC") and the

Financial Industry Regulatory Authority ("FINRA"). In his twenty-eight years at The Hartford,

he developed expertise in the details of a wide range of life insurance products. During this

period, he sold these products primarily through the financial services industry, i.e., through

stockbrokers who worked with Whinfield to sell the product to the ultimate customer. These

---

[2] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be
deemed a Conclusion of Law, and vice-versa.

transactions are known in the industry as "wholesale" sales, because someone else (here, the stockbroker) has the relationship with the ultimate customer. (Whinfield Tr. Test.) In contrast, "personal production," refers to "[s]elling insurance directly to an individual client." (SOF ¶ 11.) In personal production, the individual who makes the sale is called a "retailer," "producer," or "agent." (*Id.*) Whinfield retired from The Hartford in 2006. (Whinfield Tr. Test.).

In 2010, Whinfield reconnected with Tom Nassiri, who was then the President of CDI, an insurance distribution company that had opened for business in April of 2010. (Whinfield Test.; SOF ¶¶ 1, 2.) Whinfield and Nassiri knew each other from The Hartford (*Id.* ¶ 15), where Nassiri had also had a long career and eventually had become Director of National Accounts. (Whinfield Test.) When they spoke in 2010, Nassiri told Whinfield that he was seeking to develop CDI into an organization that would sell life insurance products on a wholesale basis to financial institutions, such as brokerage houses. (Whinfield Test.)

CDI is a subsidiary of Capitas Financial, Inc. ("CFI"). (SOF ¶ 3.) Another subsidiary of CFI is Capitas Agents, LLC ("CAL"), a pass-through entity that holds all of CFI's life insurance licenses and accepts payment of commissions for non-variable products from insurance companies. (*Id.* ¶ 4.) CFI provides administrative services to CDI and CAL. (*Id.* ¶ 5.) [3] Another related entity that figures in the case is the Leaders Group, Inc. ("Leaders"), a broker-dealer regulated by the SEC and FINRA. (*Id.* ¶ 7.) CDI's bylaws state that Leaders is its "wholesale broker-dealer in sales where a registered broker-dealer was required (i.e., where the product being sold was a registered securities product)." (*Id.* ¶ 9.) Leaders also provided CDI with background information on new hires, professional liability coverage, and "supervisory services." (*Id.*) David Wickersham, the President, CEO, and sole shareholder of Leaders, is a

---

[3] CFI and CAL were defendants in this action until this Court granted their motion for summary judgment as to Whinfield's claims against them.

founder, shareholder, director, and the Chief Compliance Officer of CFI, and a director of CDI.
(*Id*. ¶ 10.) Other key individuals associated with CDI are Blake Mohr, who at the relevant time,
was a CDI Director and is currently its Chief Executive Officer;[4] and Rick Maholchic, who was
CDI's Vice President and Director of Sales. (Mohr Test.; SOF ¶ 6; Tr. Ex. 12.) Mohr testified at
trial, and deposition testimony of Nassiri and Mohr were also presented at trial.

    **B.  Whinfield's Employment with CDI**

       During their initial conversations in 2010, Nassiri told Whinfield that there was an
opportunity for him to join CDI in Atlanta, Georgia. After a visit to Atlanta and further
discussions with Nassiri, Whinfield decided to "sign on" with CDI. (Whinfield Test.) He
executed a Sales Vice President Employment Agreement (the "SVP Agreement") with CDI,
effective August 5, 2010. (SOF ¶ 17.) The SVP Agreement created an "at will" employment
relationship and covered Whinfield's employment selling life insurance wholesale to financial
institutions on behalf of CDI in the State of Georgia. (*Id*. ¶¶ 18-19.)

       As the SVP Agreement was a focal point of the trial, it is worth examining in some detail.
The SVP Agreement makes clear that Whinfield was expected to sell a variety of life insurance
products, including those regulated as securities, on behalf of CDI to "National Accounts" and
"Regional Accounts," i.e., financial institutions. (Tr. Ex. 2.) Section 2 of the SVP Agreement
governs Whinfield's compensation, including his commission and reimbursable expenses. (*Id*.)
Section 2.1 of the SVP Agreement provides as follows:

> CDI shall pay to the Employee at the end of each month a commission payment
> ("Commission") equal to the product of forty-five (45%) of all Profits (as defined
> below) attributable to the Employee. For purposes of this Agreement, the term
> "Profits" shall mean all revenue that CDI receives from the Products sold by the
> Employee less the aggregate amount of the Expenses (as defined in Section 2.3)

---

[4] CDI is no longer in business, and Mohr is thus the CEO of a "dormant" company. (Mohr Test.)

> paid to the Employee during the then current calendar month. All Commission
> payments will be paid to the Employee less regular deductions and withholdings.

(*Id.*) This provision addresses the allocation between CDI and the Sales Vice President

("SVP") of "override commissions," an amount representing the difference between (1)

the total amount paid out by the insurance company that issues the life insurance policy

and (2) the commission paid to the retailer, producer, or agent (the "retail commission" or

"base commission"). (SOF ¶¶ 13, 21.) Override commissions represent CDI's primary

source of revenue. (*Id.* ¶ 12.) The parties agree that the SVP Agreement does not address

"retail commissions" for personal production. (*Id.* ¶ 22.) This absence was a function of

CDI's business, which was created to make wholesale sales, not retail sales. (Mohr Tr.

Test.) Nonetheless, CDI's SVPs sometimes engaged in "personal production" or retail

business, which also generated override commissions for CDI, and CDI did not turn away

such business. (SOF ¶ 12; Mohr Tr. Test.).

     Section 2.3 of the SVP Agreement classifies certain advances made to SVPs by

CDI, including a monthly draw and other monthly expenses such as gas, phone, travel

and entertainment, as expenses to CDI, and permits CDI to recover those expenses from

the SVPs' commissions. (Tr. Ex. 2.) The parties agree that CDI is entitled to recover

$88,935.47 in expenses incurred by Whinfield under  Sections 2.1 and 2.3 of the SVP

Agreement. (Pl.'s Am. Prop. Find. at 9; Def.'s Am. Prop. Find. at 26.)

     Another important provision of the SVP Agreement in this case is  Section 10.7,

which provides that "[n]o provision of this Agreement may be modified, amended,

waived or terminated except by an instrument in writing signed by the parties to this

agreement." (Tr. Ex. 2 ¶ 10.7.) No formal written amendment was ever signed by Mr.

Whinfield and CDI. (Whinfield Test.) Nonetheless, there was evidence at trial that CDI

and the SVPs, including Whinfield, had a common understanding that CDI would periodically revise the override commission formula. Whinfield testified that a grid that CDI provided its SVPs showing the override percentages that applied to the sales of life insurance policies of specific insurers to specific financial institution customers was considered to be the "Bible"—the source he and other SVPs consulted when calculating their expected compensation from a particular deal. (Whinfield Test.; Tr. Ex. 4.) The grid includes a step-by-step illustration of the calculation of an override commission. The illustration includes, at Step 2, the deduction by CDI of a "processing" fee equal to 10% of the target premium. Mohr testified credibly that the processing fee represented the expenses incurred by CDI or its "franchise affiliates" for documenting and otherwise processing the transaction. (Mohr Tr. Test.) Mohr also testified that CDI sent out updates to the grid on an annual basis—in which the percentages were typically revised—and CDI used the updated grids to calculate commissions to be paid to SVPs. (Mohr Test; see Tr. Exs. 5 & 15.) None of the grids admitted into evidence bore handwritten signatures by CDI or by Whinfield, and Mohr could not recall if CDI obtained the SVPs' signatures on any of the grids. (Tr. Exs. 4, 5 & 15; Mohr Test.)

As part of his employment with CDI, which was itself not authorized to sell regulated securities products, Whinfield was also required to become a "registered representative" with Leaders. Whinfield did so, entering into a written agreement with Leaders. (SOF ¶¶ 24-25; Tr. Ex. 24.) The agreement with Leaders does not set forth a specific compensation schedule but requires Leaders to pay Whinfield "commission and overrides as agreed with [Leaders] or provided in bulletins or other published compensation schedules." (*Id*. ¶ 47.) Before the dispute

arose, Whinfield never received a bulletin or other schedule from Leaders detailing his compensation. (Whinfield Test.)

### C.  The Lenoci Cases

Beginning in August 2010, Whinfield spent approximately nine months living and working in Georgia—traveling home to Connecticut on the weekends—but he failed to close any sales during that time. (SOF ¶¶ 26-27.) Upon Whinfield's return to Connecticut, he instructed CDI to stop his monthly draw, but neither party terminated his employment. (*Id.* ¶ 27; Whinfield Test.) Whinfield does not dispute that, after nine months of earning a draw and selling no insurance, he owed CDI $88,935.47 in expenses. (*Id.* ¶ 28; Pl.'s Am. Prop. Find. at 9.)

In Connecticut, Whinfield worked on selling life insurance policies from Lincoln Financial Group ("Lincoln") to Alfred Lenoci Sr. (the "Lenoci Sr. Case") and Alfred Lenoci Jr. (the "Lenoci Jr. Case," together, the "Lenoci Cases"), both of whom were Connecticut residents.[5] (SOF ¶ 29.) The Lenoci Sr. Case would become the largest life insurance transaction in CDI's short history; it would also be the first retail case CDI would handle that involved a variable product. (Whinfield Test.; Mohr Test.)[6] Whinfield had sold an insurance policy to Lenoci Sr., in the past, and began working with a retail broker named Allen Vetrosky to renew the relationship and extend it to include Lenoci Jr. (Whinfield Test.)[7]

Because Whinfield's territory under the SVP Agreement was Georgia, he was not obligated to place the Connecticut-based Lenoci Cases through CDI. He chose to do so because

---

[5] The parties refer to opportunities to sell life insurance as "cases," and the Court will use that terminology here.

[6] Mohr testified that CDI later wrote a larger policy.

[7] During this time, Whinfield also sold another policy to a client in Michigan, Ms. Shoemaker, and his complaint in this case initially included a claim against CDI related to the Shoemaker sale. He later dropped that claim.

he owed CDI expenses and believed the commissions he would earn would enable him to retire that debt. (Whinfield Test.)

Maholchic and Nassiri were aware that Whinfield was working on the Lenoci Cases because Whinfield communicated about the cases with them by e-mail, and Nassiri approved placing the cases with CDI. (*Id.* ¶ 33; Tr. Exs. 6 & 7; Whinfield Test.) Maholchic and Nassiri were also aware that the cases were personal (retail) production, and not wholesale production. Whinfield sent an e-mail to Maholchic on July 29, 2011, stating, "I just got the go ahead on that $200,000+ personal production case. How does personal comp get paid?" (*Id.* ¶ 34; Tr. Ex. 7.)[8] Maholchic answered on July 30, 2011, with an e-mail stating, "You will get 85% of target as agent and normal SVP overrides. Good job[.] Keep me informed[.]" (*Id.*) Whinfield understood the reference to "target" to refer to "target premium," an amount determined by the insurer issuing the policy to serve as a basis for calculating commission; target premium is different from the premium paid by the purchaser of the policy. (Whinfield Test.) Whinfield understood the reference to "normal SVP overrides" in Maholchic's email to refer to the override commission provisions of the SVP Agreement. (Whinfield Test.) During his deposition testimony, which was presented at trial, Nassiri agreed with Whinfield's understanding of Maholchic's email. (Nassiri Tr. 25:17-26:21.) After his receipt of this email, Whinfield continued to work to close the Lenoci Cases.

All of CDI's approximately 20 SVPs—except Whinfield—attended an August 2011 sales meeting in Los Angeles. (Nassiri Tr. 29:8-29:21.) At that meeting, CDI leaders discussed compensation on personal production with the SVPs—a subject about which there had been

---

[8] The Lenoci Cases had started as wholesale production cases, because the initial plan was to make Allen Vetrosky the retail broker. (Whinfield Test.; Mohr Test.). Later, however, Mr. Whinfield became the retail broker—a fact that became apparent to CDI as early as Whinfield's July 29, 2011 email to Maholchic.

confusion in the sales force due to communications by Maholchic that, according to Mohr and Nassiri, were not accurate. (Mohr Test.; Nassiri Test.). At the conclusion of this discussion, it was "resolved" that SVPs would be compensated at 85% of target premium, with no overrides, on personal production cases, and CDI ultimately paid out 85% of the target premium as retail commission on every personal production case it has ever had. (Mohr Test; SOF ¶ 14.). On October 10, 2011, Maholchic wrote an email to all of the SVPs, including Whinfield, "in which he memorialized the announcement [made] at the August meeting in Los Angeles." (SOF ¶ 36.) The e-mail stated:

> Personal production does not apply to your P&L. It is paid through your paycheck as you are a W-2 employee. Payment of personal production is dependent upon your validation of your SVP or BDP sales agreement. If you are not validated when payment of personal production is warranted it will be held until such time you are in a validated status. If you have any questions, please let me know.

(Tr. Ex. 19.) Mohr testified that "validation" in this context meant that the SVP did not owe CDI reimbursement for any expenses. (Mohr Test.) Nassiri and Mohr both testified that it would have been clear to Whinfield, or any SVP, that Maholchic's e-mail meant CDI would not provide overrides as compensation for personal production. (Nassiri Tr. 30:8-31:5; Mohr Tr. Test.). Nassiri said that this would have been clear to SVPs "[b]ecause of discussions at the [August] meeting." (Nassiri Tr. 31:9-31:12.) Whinfield, who had not attended the meeting, testified that he found the email confusing. Responding to Maholchic's invitation to contact him with questions, Whinfield replied to the email a few hours later, asking: "Exactly what does this mean for me and the Lenoci case[?]" (Tr. Ex. 19.) Maholchic answered Whinfield's question about an hour later, with one word: "None[.]" (*Id.*) ) Whinfield understood this response to mean there would be no impact on his compensation for the Lenoci cases, and continued working to close the

Lenoci Cases. (Whinfield Test.) Mohr acknowledged that Maholchic's reply was "inarticulate," but believed that Whinfield should have sought clarification. (Mohr Test.)

Whinfield continued to update Nassiri and Maholchic on his progress. After Whinfield sent a status update to Maholchic and Nassiri on October 28, 2011 (Tr. Ex. 9.), Nassiri inquired by email on November 4, 2011, "so, what's the latest[?]" (*Id.* at 1-2.) Whinfield replied, copying Maholchic, with another update. Nassiri then responded to Whinfield stating, "Thanks[,] good luck and keep me posted." (*Id.* at 1.) Whinfield sent another e-mail update to, among others, Nassir, Maholchic, and Mohr on December 20, 2011, announcing that the Lenoci Cases were nearly finalized. Maholchic responded to Whinfield on December 26, 2011, congratulating Whinfield on working the cases to a successful close, and asking a few questions. (Tr. Ex. 10.) Closing the Lenoci Cases by the end of 2011 was important to CDI because, as noted, the Lenoci Sr. Case was the largest CDI had handled to date. (Whinfield Test.; Mohr Test.) Ultimately, the deals were closed and the two policies were issued by Lincoln before year end—a variable life insurance policy for Lenoci Sr. and a non-variable product for Lenoci Jr. (Whinfield Test.)

**D. The Dispute**

On January 2, 2012, Whinfield emailed Nassiri, asking "When can I expect to see some commissions on the Lenoci case? The original $500k was sent in on the 21st. If not overrides I should have received personal commissions by now." (Tr. Ex. 11.) Whinfield expected to receive both "personal" (also known as "base" or "retail") commissions, as well as override commissions, on the Lenoci Cases. (Whinfield Test.) Nassiri responded the next day, saying "I will get you an answer . . . by late this evening." (Tr. Ex. 11.) On January 12, 2012, CDI paid Whinfield $74,630.00, representing an advance of the base commission on the Lenoci Jr. Case— and equaling 85% of the target premium ($87,800.00). (SOF ¶ 39; Tr. Ex. 14 at 2.) This amount

did not include override commissions, and CDI did not deduct the expenses that Whinfield owed CDI from this advance. (SOF ¶ 39.) CDI had received a total of $102,724.51[9] in revenue on the Lenoci Jr. Case, of which it paid Whinfield $74,630 as base commission. (*Id.*) On January 20, 2012, Leaders paid CDI $534,506.82 of the total commissions it had received from Lincoln for the Lenoci Cases. (*Id.* ¶ 40.)

On February 2, 2012, Nassiri sent an e-mail to Whinfield containing commission calculations prepared by Jodee Deutsch ("Deutsch"), the Chief Operating Officer of CFI. (*Id.* ¶ 41; Tr. Exs. 14, 18.) The document reported a target premium of $581,250.00 for Lenoci Sr., and a retail commission of 85%, or $494,062.50. (*Id.* ¶ 41b.) The document also reported an "excess premium" of $1,313,400.20 for the Lenoci Sr. Case, and an excess commission of 2.5 percent, or $32,835.01. (*Id.* ¶ 41c.) Total commission on Lenoci Sr., $526,897.51 (i.e., the sum of the retail commission and the excess commission), was then reduced by a broker-dealer fee (i.e., a fee that Leaders charged to process the Lenoci Sr. transaction, which involved a variable life insurance policy, a SEC-regulated product) of 5%, or $26,344.88, resulting in subtotal of $500,552.63. (*Id.* ¶ 41d.) "[T]he retail commission subtotal was further reduced by the undisputed commission assignment in the amount of $173,939.06 [i.e., the amount to be paid to Vetrosky for his work in developing the Lenoci Cases], leaving a total of $326,613.57 for the Lenoci, Sr. base commission." (*Id.* ¶ 41e.) For Lenoci Jr., Deutsch's report indicated a target premium of $87,800, and after taking 85% of the target premium, the resulting commission was $74,630. The document also reported that Whinfield had accumulated expenses of $92,040.86, but it "did not calculate or report any override commissions for the Lenoci Cases." (*Id.* ¶ 41g; Tr. Ex. 14.)

---

[9] This amount, which the parties presented by agreement at trial, is about $1.50 less than the amount in their pretrial stipulation, which states that "Lincoln ultimately paid $102,726.00 in total commissions to CAL, which forwarded the commissions to CDI." (SOF ¶ 39.)

The day after receiving this document, Whinfield spoke with Nassiri and objected to the expense calculation—which he thought was excessive.[10] Although Whinfield testified that there was no discussion of override commissions in the phone call, Nassiri acknowledged that by February 2, 2012, Whinfield had complained about the fact that he was not receiving override commissions on the Lenoci Cases. (Nassiri Tr. 51:14-52:15.) Later, on February 6, 2012, Nassiri emailed Whinfield, saying that CDI was "ready to cut you a check based on the comp calculations I provided you on Friday" (i.e., the document prepared by Deutsch (Tr. Ex. 14)), but asking that Whinfield "confirm [his] agreement with the calculation in order to process the check." (Tr. Ex. 17.) Whinfield responded only that "I am expecting a check tomorrow." (*Id.*) Based on Deutsch's calculations, CDI sent a check for $233,872.61 to Whinfield on February 7, 2012, as "payment in full" for the Lenoci Cases." (SOF ¶ 42.) The cover letter stated that "[e]ndorsing this check acknowledges receipt of payment in full for the Lenoci cases." (Tr. Ex. 18; SOF ¶ 42.) Because Whinfield disagreed with the amount, he did not endorse or deposit the check. (SOF ¶ 44.) The $233,872.61 amount was the total in retail commissions from the Lenoci Sr. Case ($326,613.57) minus $92,740.96 in expenses (*see* note 10, *supra*), and "did not include any override commissions." (*Id.* ¶ 43.)

The parties' relationship soured further. Whinfield delayed in sending Lincoln a signed "illustration," a document needed to finalize the Lenoci transactions (even though the policies had already issued), and contemplated "selling away" the Lenoci Cases, i.e., placing them through an entity other than CDI. (Whinfield Test.; Mohr Test.) On February 14, 2012, Nassiri

---

[10] The Court addressed Mr. Whinfield's objections to most of the expense calculation at the summary judgment stage, relying on the parole evidence rule to reject his argument that oral discussions between him and Nassiri occurring at the time he was hired had varied the expense formula set forth in the SVP Agreement. The remaining difference over expenses—about $4,000 –was worked out by the parties before trial in a stipulation stating that the total expenses owed by Whinfield to CDI amount to $88,935.47.

notified Whinfield that Lincoln was "charging back the commissions" because it had not yet

received the signed illustration for Lenoci Sr. (SOF ¶ 45.) As a result, CDI stopped payment on

the $233,872.61 check. (*Id.* ¶ 45.) Lincoln, however, did not charge back the commissions.(*Id.* ¶

45.)

> On February 17, 2012, Nassiri sent an e-mail to Whinfield, copying Wickersham, stating:
>
> The payroll check from Capitas Distributors was sent in error as the Lenoci Sr.
> policy was written utilizing variable universal life product and you are agent on
> the case. As a result, the compensation should have been paid to you directly from
> the Leaders Group. In addition, the Leaders Group has informed Capitas
> Distributors Inc. that they will not pay any commission on the Lenoci Sr. case
> until such time that all delivery requirements are received in good order. Finally,
> due to the activities surrounding the Lenoci Sr. policy, consider this message
> notice that you are suspended from conducting business subject to internal review
> from the Leaders Group.

(SOF ¶ 46; Tr. Ex. 22.) As noted, CDI's policy was that sales of SEC-regulated products had to

be made through Leaders, a broker-dealer. CDI reversed the payment transaction on February 24,

2012, returning $325,958.51 to Leaders and retaining $208,548.31 of the original $534,406.82 it

had received from Leaders.  (SOF ¶ 47)

Ultimately, Whinfield provided the signed illustration to Lincoln, and dropped his idea of

"selling away" the transactions. (Whinfield Test; Tr. Ex. 527.) On or around February 27, 2012,

Leaders paid Whinfield $273,399.00 in commissions on the Lenoci Sr. Case. (SOF ¶ 48.) This

amount reflected a lower retail commission than the one calculated in the Deutsch document

($326,613.57 vs. $273,399.00), and included no deduction for expenses and no amount for

override commissions. Whinfield cashed the check but questioned the amount in a February 28,

2012 email to Leaders. (Whinfield Test.; Tr. Ex. 23.) David Wickersham of Leaders responded

that for retail business, Leaders paid out a maximum of 85% of the total retail commission it

received (which itself was 85% of the target premium); this was ten percentage points less than

Leaders paid out on wholesale business because "the liability is less" on wholesale business. (Tr. Ex. 23.) After further inquiry from Whinfield's counsel, Leaders sent a "Registered Representative Appointment Grid" showing that its registered representatives would receive 85% of the base or retail commission (i.e., 72.25% of the target premium) on variable life policies valued at $150,000 or more. (Tr. Ex. 26.) Whinfield testified that he had never seen this document before it was sent to his lawyer on March 2, 2012. (Whinfield Test; Tr. Ex. 26.)

Whinfield resigned as a registered agent with Leaders on March 15, 2012, and was terminated by CDI by letter dated March 19, 2012. (SOF ¶¶ 49-50.)

## II.    CONCLUSIONS OF LAW

The dispute between Whinfield and CDI focuses on two issues: (1) whether the SVP Agreement required CDI to pay Whinfield override commissions on the two Lenoci Cases (Count One), and (2) whether CDI was required to pay Whinfield base or retail commission on the Lenoci Sr. Case under its separate agreement with SVPs governing base commissions (Count Five). There is also a dispute over whether, if CDI was required to pay override commissions, a 10% "processing fee" should be deducted in the calculation of the amount owed to Whinfield. It is undisputed, however, that (a) if CDI was required to pay override commissions, it breached its obligation to do so, (b) if CDI was required to pay Whinfield base commissions on the Lenoci Sr. Case, it was required to pay a total 85% of the target premium as base commission and currently owes Whinfield $52,689.75, an amount equal to 10% of the total commission on Lenoci Sr., which is approximately equal to the difference between what CDI initially tendered

as base commissions on Lenoci Sr. and what Whinfield actually received as base commission on Lenoci Sr. from Leaders;[11] and (c) Whinfield owes CDI $88,935.47 in expenses.

**A. Breach of the SVP Agreement (Count One)**

*1. The Amendment*

On its face, the SVP Agreement does not apply to the Connecticut-based Lenoci Cases, because the geographic scope of the Agreement is limited to Georgia. Whinfield argues that the Agreement was amended to cover Whinfield's work in Connecticut, and that the language of the Agreement—which applies to the employee's sales of all life insurance products placed through CDI (Tr. Ex. 2, ¶¶ 1.3, 2.1) and makes no exception for retail sales—is otherwise broad enough to cover the Lenoci Cases. In denying summary judgment on this issue, the Court found that the Agreement was ambiguous as to whether it covered the Lenoci Cases, and now finds, based on the evidence at trial, that it was originally not intended to cover retail sales at all. The Court credits Mohr's testimony that CDI was set up to pursue wholesale business, and that retail business or personal production was never part of the business plan; indeed, the fact that the parties never contemplated personal production at the outset—and failed to address unequivocally how compensation for such production would be paid—is what triggered this dispute. But the Court also finds that the SVP Agreement was amended by the Maholchic-Whinfield emails to cover the Lenoci Cases; at least for those transactions, it was amended to extend its coverage to Connecticut and to cover personal production.

As noted, Section 10.7 of the SVP Agreement requires that any modifications or amendments be in writing and signed by the parties, but the email exchange between Whinfield

---

[11] The amount of $52,689.75 was presented at trial, and neither party objected to its accuracy. The number, however, differs slightly from the figures supplied in the parties' pretrial filings (ECF No. 127 at 8; SOF ¶¶ 47-48.)

and Maholchic complied with this provision. Whinfield's typed name—"John"—appeared beneath his opening query in the July 29, 2011 email: "I just got the go ahead on that $200,000+ personal production case. How does personal comp get paid?" (Tr. Ex. 7), and there was no doubt that it came from his email address. And the critical response from Maholchic on July 30—"You will get 85% of target as agent and normal SVP overrides. Good job[.] Keep me informed"—was followed by a full signature block, including Maholchic's name, professional license designations and license number, position as Vice President and Director of Sales, email and physical addresses, and telephone numbers. These emails plainly satisfy the requirement of a writing. Under the Connecticut Uniform Electronic Transactions Act ("CUETA"), Conn. Gen. Stat. §§ 1-266 et seq., the Maholchic-Whinfield exchange would also be sufficient to satisfy a signature requirement imposed by any statute, regulation, or other "law." Conn. Gen. Stat. § 1-272(d) ("If a law requires a signature, an electronic signature satisfies the law."); *see also id.* § 1-272(a) ("A record or signature may not be denied legal effect or enforceability solely because the record or signature is in electronic form."); *id.* § 1-272(b) ("A contract may not be denied legal effect or enforceability solely because an electronic record was used in the formation of the contract.").[12] The statute defines "electronic signature" as "an electronic sound, symbol or process attached to or logically associated with a record and executed or adopted by a person

---

[12] The governing law provision in the SVP Agreement does not specify the State whose law will govern the Agreement. (Tr. Ex. 2 at 8.) Nonetheless, the parties have in the summary judgment briefing and in their proposed finding of fact and conclusions of law assumed that Connecticut law applies. The Court will adopt this assumption as well, not least because Whinfield resided in Connecticut when the Lenoci Cases were sold and the Lenocis themselves resided in Connecticut. As for the applicability of the CUETA itself, there is no doubt that the parties in this case had a practice of conducting their transactions by electronic means, Conn. Gen. Stat. § 1-270(b) (CUETA applies only to "transactions between parties each of which has agreed to conduct transactions by electronic means."), as exemplified by CDI's email announcements of changes to the compensation grid, Whinfield's updates on developments in the Lenoci cases, and Nassiri's notices to Whinfield about reversing the commission payout.

with the intent to sign the record." *Id.* § 1-267(8). While Maholchic did not testify at trial, the

circumstances—including the fact that he was an officer of CDI, was the Director of Sales, was

Whinfield's boss, was fielding a question from a salesperson about compensation for a particular

type of sales transaction, and included his entire signature block with his response—all suggest

that he "adopted" the email "with the intent to sign" it, Conn. Gen. Stat. § 1-267(8), and the

Court so finds based on all of the evidence presented at trial.

      To be sure, that the email exchange satisfies the signature requirement of any "law," by

virtue of the CUETA, does not mean it satisfies the signature requirement of Section 10.7 of the

SVP Agreement. *See* Conn. Gen. Stat. § 1-270(d) (allowing parties to vary from statute by

agreement). But Section 10.7 does not specify a handwritten signature, as opposed to an

electronic signature, and in an age when electronic communications have come to dominate

commercial transactions, electronic signatures are increasingly common. Further, the parties

entered into the SVP Agreement against a statutory backdrop recognizing and favoring

enforcement of electronic signatures. Conn. Gen. Stat. § 1-269 (CUETA applies to electronic

records and electronic signatures created on or after October 1, 2002); *see also* Electronic

Signatures in Global and National Commerce Act ("E-SIGN Act"), Pub. L. No. 106-229, 15

U.S.C. § 7001 *et seq.* (2000) (enacting substantially similar federal provisions regarding

electronic records and signatures in interstate commerce). Under these circumstances, the

absence of a specification in the agreement as to the nature of the signatures creates ambiguity as

to the parties' intent. The Court may thus consider extrinsic evidence, including the parties'

course of dealing, in determining that intent. *Cruz v. Visual Perceptions, LLC*, 84 A.3d 828, 836-

37 (Conn. 2014) ("Because the letter agreement was ambiguous as to whether it was intended to

constitute a contract of employment for a definite term or, instead, was intended to set the terms

and conditions of an at-will employment contract, the trial court was required to resolve this ambiguity by considering the extrinsic evidence and making factual findings as to the parties' intent."); *Shawmut Bank Connecticut, N.A. v. Connecticut Limousine Service, Inc.*, 670 A.2d 880, 884 (Conn. App. 1996) ("All relevant evidence is admissible on the issue of contract interpretation, and any determination of the meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." (internal quotation marks and citation omitted)).

Based on the evidence presented at trial, the Court finds that the parties intended to treat electronically signed documents as binding commitments. While the version of the SVP Agreement introduced into evidence does contain a handwritten signature by Whinfield (albeit none by CDI, Tr. Ex. 2), the parties' subsequent dealings show that they treated electronically signed emails as firm commitments about important aspects of their business—including compensation payable under the SVP Agreement. (*See also* note 12, *supra*.) As noted, CDI sent out annual broadcast emails updating the commissions grid that SVPs such as Whinfield treated as the "Bible," and Mohr acknowledged at trial that CDI paid its SVPs in accordance with the updated grids—which differed in some respects from the SVP Agreement—, even though he did not know if (and no evidence was presented that) handwritten signatures had ever been obtained. (*See, e.g.,* Tr. Ex. 8 & 15 (electronically signed emails from Maholchic dated August 5, 2011, and Feb. 3, 2012 attaching revised SVP compensation grids).) [13]

---

[13] The August 2011 Revised SVP Compensation grid changed the 45 percent revenue share from the original 2010 SVP Agreement to 40 percent for total production up to $499,999 of target premium produced and 50 percent for total production in excess of $500,000. (Tr. Ex. 8, at 2.) The 2012 SVP Compensation Plan sent with the February 3, 2012 e-mail created three production levels with revenue sharing percentages of 30%, 40%, and 50% based on target

Finally, the Court finds credible Whinfield's testimony that he relied on Maholchic's July 30 email as a binding commitment to pay override as well as base commissions. He was not required to place the Lenoci Cases through CDI, and could have shopped the business elsewhere in search of a larger payout—something he did not seek to do until February 2012 after the dispute arose. His decision to place the Lenoci Cases through CDI provided consideration for the commitment made in Maholchic's July 30 email. *TD Bank, N.A. v. M.J. Holdings, LLC*, 143 Conn. App. 322, 332 (2013) ("[M]odification of an agreement must be supported by valid consideration and requires a party to do, or promise to do, something further than, or different from, that which he is already bound to do." (internal citations and quotation marks omitted)). And although Maholchic's July 30 email was short, it was sufficiently definite to form a contract, contrary to CDI's argument on this point. Formulated as a response to a specific question—"how does personal comp get paid"— the response, "You will get 85% of target as agent and normal SVP overrides," incorporated the SVP Agreement (and the compensation grids) by reference, telling Whinfield, in essence, "you will get the override commissions you ordinarily receive." (Whinfield Test; Nassiri Test. (Tr. 25:10 – 26:19) (agreeing that Maholchic email meant Whinfield would receive overrides, "in other words, wholesale commissions over and above" under the SVP Agreement)). This was sufficiently "definite and certain" to satisfy Connecticut law. *L & R Realty v. Connecticut Nat. Bank*, 53 Conn. App. 524, 534-35 (1999) ("To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties.") (internal quotation marks and citation omitted)).

---

premium production in the calendar year. (Tr. Ex. 15 at 2.) These documents evidence the parties' practice of changing the compensation terms in the SVP Agreement by means of electronically signed documents.

Further evidence of Whinfield's understanding that he would receive overrides comes from his response to the October 10, 2011 email from Maholchic to the sales force (an electronically signed communication to which CDI urges the Court to bind Whinfield) "remind[ing] everyone" of the announcement at the Los Angeles meeting that Whinfield had not attended. Had Whinfield not viewed Maholchic's earlier, July 2011 email as creating a binding commitment for his compensation on the Lenoci cases—and had he not been concerned that the October 2011 email might interfere with that commitment—, he would not have needed to ask for clarification—"[e]xactly what does this mean for me and the Lenoci case." (Tr. Ex. 19.) Maholchic's reply—"none"—, though cryptic, did not suggest that the July commitment was being rescinded or that there would be any other impact on Whinfield's compensation for the Lenoci Cases. At best for CDI, the October 10, 2011 e-mail exchange lacks the specificity and clarity of the previous July 2011 e-mail exchange, and thus failed to undo Maholchic's July 2011 commitment. Further, given that the Lenoci Sr. Case was then the largest deal CDI had ever done, Whinfield could reasonably have read Maholchic's July and October emails together as an acknowledgement that the Lenoci Cases were *sui generis*, and that his "85% of target plus overrides" deal remained intact. In addition, Whinfield's January 3, 2011 email to Nassiri— which mentions both override and base commissions (Tr. Ex. 11("[i]f not overrides, I should have received personal commissions by now")—is consistent with an understanding that Maholchic's July 30 email continued to bind CDI, as is Nassiri's testimony that by February 2, 2012, Whinfield was complaining about not receiving override commissions on the Lenoci Cases. (Whinfield Test.; Nassiri Tr. 51:14-52:15.)

CDI argued at trial that "Maholchic was not authorized to discuss any financial issues regarding commissions, draws, income, [or] benefits with any employees." (Nassiri Tr. 27:2 –

27:5). But Maholchic was the National Sales Manager (Nassiri Tr. 117:16 – 117:22), an officer

of the company (Nassiri Tr. 116:19 – 116:24; Mohr Test.), and Whinfield's boss. (Nassiri Tr.

118:3 – 118:6.) Maholchic was responsible for "manag[ing] the activities of [SVPs] and business

development coordinators." (Nassiri Tr. 23:19 – 24:1) Prior to the e-mail exchanges that formed

the amendment, Maholchic sent at least one e-mail to all SVPs on behalf of CDI regarding SVP

compensation. (*See* Tr. Ex. 8.) Even Nassiri agreed that it was "fair for an SVP to rely on the

national sales manager to clarify a compensation issue[]" in "generic terms." (Nassiri Tr. 117:16

– 117:22.) And Mohr acknowledged that CDI sent nothing to the sales force in writing

suggesting that Maholchic, the National Sales Manager, lacked authority to make binding

commitments to the sales force. (Mohr Test.) To the contrary, after the Los Angeles meeting—at

which, in Mohr's words, the issue of commissions on personal production was "resolved"—CDI

again relied on Mohr to reiterate the announcement by email to the sales force. (Tr. Ex. 19.)

Although Nassiri testified that he told Maholchic that Maholchic "was not authorized to discuss

financial matters, including commissions . . . with sales reps" (Nassiri Tr. 117:3-117:7), there

was no evidence that Nassiri—or anyone else at CDI— ever told Whinfield not to ask Maholchic

questions about commissions or not to rely on Maholchic's statements about commissions.

Based on all of the evidence, the Court finds that Maholchic had authority to modify the SVP

Agreement to provide for payment of override commissions on the Lenoci Cases, and did so in

his email exchanges with Whinfield.

     As noted above, there is no dispute that CDI failed to pay override commissions on the

Lenoci Cases, and thus the Court finds that it breached the SVP Agreement.

     *2. Processing Fee*

     Nassiri testified that if override commissions applied to the Lenoci cases, then CDI would

have to apply a 10% processing fee before calculating the 45% profit share. (Whinfield Test.,

Nassiri Tr. 216:22 – 217:19.) Although a "processing fee" is not explicitly mentioned in the text of the SVP Agreement,  Section 2.1, which describes employee compensation, states that "[a]ll Commission payments will be paid to the Employee less regular deductions and withholdings"— a phrase that is not self-defining and, once again, creates an ambiguity. (Tr. Ex. 2.) Whinfield argues that the phrase refers to withholdings for income taxes and employee benefits, such as insurance. CDI counters, persuasively, that insurance expenses are covered elsewhere in the SVP Agreement:  Section 2.3(e) states that, "[i]f CDI covers the Employee's portion of . . . insurance expenses . . . CDI shall be entitled to recover and deduct the aggregate amount of the Employee's portion of such insurances expenses from the Employee's Commission." (Tr. Ex. 2.) And Section 10.11 allows CDI to "withhold from any benefits payable under this Agreement all applicable federal, state, city, or other taxes. . ." (*Id.*)

All versions of the compensation grid admitted into evidence—which, as noted, Whinfield dubbed "the Bible" and Mohr agreed were used to calculate payouts to SVPs— include the processing fee and specifically instruct both that it is to be a percentage of the target premium and that it is to be deducted from the revenue received by CDI in calculating the override commission. (Tr. Exs. 4, 5 & 15.) The Court concludes that this course of dealing between the parties illuminates the meaning of the phrase "less regular deductions and withholdings" in  Section 2.1 of the SVP Agreement, and thus that the SVP Agreement allowed CDI to deduct the processing fee—which the parties agreed is 10% of target premium—in the calculation of the override commissions.

3.   *Damages: Amount CDI Owes Whinfield in Override Commissions*

The parties agree that "CDI received $102,724.51 in revenue from Lincoln in relation to the Lenoci, Jr. policy." (Tr. Ex. 38 at 3.) On January 12, 2012, CDI paid Whinfield an advance on the base commission of 85% of the target premium of $87,800.00 for the Lenoci Jr. Case, or

$74,630.00. (SOF ¶ 39; Tr. Ex. 14 at 2.) Subtracting $74,630.00 from $102,724.51 results in $28,094.51, which is the amount of revenue in CDI's possession from the Lenoci Jr. Case to be used for calculating override commission. "CDI received $208,548.32[14] in override commissions from Leaders in relation to the Lenoci, Sr. policy and it later received $32,835.01[15] in additional [excess] override commissions, for a total of $241,383.32" in override commissions on the Lenoci Sr. Case. (Tr. Ex. 38 at 3.) Thus, the parties agreed at trial that CDI had a total of $269,477.84 in revenue in its possession from the Lenoci Cases.

The next step is to subtract the processing fee (10% of target premium) from $269,477.84 (Tr. Ex. 4.) The parties did not dispute during trial that the processing fee on the Lenoci Jr. Case is $7,498.28, and the processing fee on the Lenoci Sr. Case is $54,906.53, which totals $62,404.81. After this processing fee is deducted from $269,477.84, the result is $207,073.02.

The next step is to subtract expenses. The parties stipulated that CDI is entitled to recover $88,935.47 in expenses incurred by Whinfield pursuant to Sections 2.1 and 2.3 of the SVP Agreement. (Pl.'s Amend. Prop. Find. at 9; Def.'s Amend. Prop. Find. at 26.) CDI's revenue minus the stipulated expense amount is $118,137.55.

One aspect of the expense deduction is more complicated. CDI paid Whinfield a recoverable draw of $6,000 per month. Under the SVP agreement, "if the Employee receives a recoverable draw in an amount exceeding $5,000 per month, any amount exceeding $5,000 per month shall be excluded from the calculation of Expenses and shall be deducted from the final calculated Commission amount." (Tr. Ex. 2 at 3.) Whinfield's $88,935.47 in expenses included

---

[14] In pretrial filings, the amount stated by Whinfield, $208,548.32, was 0.01 more than the amount stated in CDI's response. The parties did not dispute the amount of $208,548.32 during trial.

[15] The $32,835.01 is commission on excess premium, calculated by taking 2.5% of the excess premium of $1,313,400.20. (Tr. Ex. 18 at 2.)

$56,215.30 in draw/payroll expenses. (Tr. Ex. 18 at 2.) Since his draw was $6,000 per month, he

was making $1,000 per month in excess of $5,000 per month. Whinfield's draw, $56,215.30,

divided by $6,000 is 9.37, or about 9 months. Thus, the parties agreed at trial that the correct

calculation (assuming overrides are due) is to multiply 9 months by the extra $1,000 to get

$9,000, which is added back to $118,137.55 to get $127,137.55 (to avoid deducting the $9,000

twice). Override commission is calculated by taking 45% of $127,137.55 and subtracting the

$9,000, yielding total damages on the claim for override commissions on the Lenoci Cases

(Count One) of $48,211.90.

**B.  Breach of Express Agreement on Base Commission (Count Five)**

Maholchic's email not only amended the SVP Agreement to provide for override

commissions; it also evidenced a separate agreement to pay 85% of target premium as a base

commission. CDI does not dispute the terms of its agreement to compensate SVPs for base

commissions; as noted, it has paid 85% of target premium on all personal production, and it paid

Whinfield 85% of target premium on the Lenoci Jr. Case. Rather, what CDI disputes is that that

agreement applied to the Lenoci Sr. Case, which involved, unlike the Lenoci Jr. Case, a SEC-

regulated product and thus, according to CDI's policies, had to be paid through Leaders, a

licensed-broker dealer.

When CDI initially calculated the retail commission to pay Whinfield on the Lenoci Sr.

Case, it based its calculation on the amount it had received from Leaders. Leaders had paid CDI

95% of the amount it received in commissions, consistent with its practice of charging a 5% fee

for wholesaling. But since the Lenoci Sr. Case involved variable life insurance—a regulated

product—it had to be paid through Leaders, according to CDI's policies, because only Leaders

was authorized to sell it. When CDI reversed the transaction and returned the money back to

Leaders, Leaders deducted an additional 10%, consistent with its own policy for retail sales, so that in all, Leaders charged a fee of 15% for retail production. Then Leaders paid Whinfield $273,399.00 in commissions on the Lenoci Sr. Case. (SOF ¶ 48; Tr. Ex. 25.)

CDI argues that Whinfield's retail commission was calculated consistent with the Registered Representative Agreement that governed Leader's relationship with Whinfield, and that CDI is not obligated to pay Whinfield the amount of the additional deduction that Leaders took. (Tr. Ex. 24.) Yet while Leaders ultimately paid Whinfield for regulatory reasons, the transaction was between CDI and Whinfield, as evidenced by CDI's extensive involvement, and the lack of involvement by Leaders as Whinfield was working on the cases. For example, in e-mail exchanges in late July 2011, Nassiri and Maholchic both congratulated Whinfield on his progress on the Lenoci Cases by e-mail (Tr. Ex. 6; SOF ¶ 35; Tr. Ex. 7) and, as discussed, Maholchic told Whinfield that his compensation would include 85% of the target premium as base commission. Further, at their request, Whinfield sent Nassiri, Maholchic, and Mohr e-mail updates on his progress in late October, early November, and late December 2011. (Tr. Ex. 9 at 1-2 and Ex. 10 at 2-3.) It was Nassiri from CDI, not anyone from Leaders, who e-mailed Whinfield, copying Mohr, Wickersham, and Deutsch on February 14, 2012, to notify Whinfield that "Lincoln is charging back the commissions" because they had not received the final signed illustration. (Tr. Ex. 20.) It was Nassiri from CDI, and not Leaders, who told Whinfield that his check had to be paid by Leaders for regulatory reasons, that Leaders would not pay commission on the Lenoci Sr. Case until all delivery requirements were in order, and that Whinfield was suspended from conducting business subject to internal review from Leaders. (Tr. Ex. 22.) In short, Whinfield's supervisors at CDI were deeply involved in Whinfield's work related to the Lenoci Cases. In contrast, there was no evidence of any communications between Whinfield and

25

employees at Leaders during the time he was working on the Lenoci Cases. No one from CDI ever suggested to Whinfield—when he opted to place the Lenoci cases with CDI and while he was working on those cases—that his agreement was really with Leaders, not CDI. Finally, everyone involved with this dispute, including Leaders employees, Deutsch, Nassiri, Whinfield, Maholchic, and Wickersham, all behaved as if it was CDI's transaction. In fact, Deutsch of CFI initially sent payment to Whinfield based on calculation of 85% of the target premium (Tr. Ex. 14), as "payment in full" for the Lenoci Cases. (Pl's Ex. 18.) Only when CDI reversed the transaction and had Leaders pay Whinfield—for regulatory reasons—did Leaders take out an additional fee, about which Whinfield had not previously been informed.

The evidence demonstrates that Whinfield, CDI, and Leaders all viewed the Lenoci Cases as CDI's, and the base commission agreement governing those transactions as one between CDI and Whinfield. The fact that Leaders ultimately paid Whinfield $273,399.00 for the Lenoci Sr. Case does not change the analysis. Based on the evidence presented at trial, the Court finds that Leaders was acting as CDI's agent in paying Whinfield part of what CDI owed on CDI's behalf. Thus, CDI still owes Whinfield $52,689.75 in base commissions on the Lenoci Sr. Case under its contract with Whinfield.

### C.  CDI is Not Liable for Double Damages under Conn. Gen. Stat. § 31-72

Whinfield argues that he is entitled to double damages and/or attorney's fees under Conn. Gen. Stat. § 31-72 because CDI acted in bad faith, arbitrarily, or unreasonably in failing to pay Whinfield override commissions and in failing to pay the proper amount of retail commissions on the Lenoci Cases. Conn. Gen. Stat. § 31-72 provides, in relevant part, "[w]hen any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, . . . . such employee . . . may recover, in a civil action, twice the full amount of such wages, with

costs and such reasonable attorney's fees as may be allowed by the court." "[I]t is well

established . . . that it is appropriate for a plaintiff to recover attorney's fees, and double damages

under [§ 31–72], only when the trial court has found that the defendant acted with bad faith,

arbitrariness or unreasonableness." *Sarrazin v. Coastal, Inc.*, 311 Conn. 581 (2014) (internal

quotation marks and citations omitted); *see Crowther v. Gerber Garment Tech., Inc.*, 8 Conn.

App. 254, 265 (1986). In *Matteson v. Great E. Dev., Ltd.*, 18 Conn. App. 618 (1989), the court

held that, in the absence of such findings, the trial court had abused its discretion "in imposing

attorney's fees when the court, in essence, found simply a breach of an employment contract."

*Id.* at 621-22.

      Whinfield argues that it was in bad faith, unreasonable, or arbitrary for CDI to promise

Whinfield override commissions and not pay them. (Pl.'s Amend. Prop. Find. at 10.) Even if

CDI later thought that this promise was a mistake, Whinfield argues, CDI "never admitted it was

a mistake or otherwise tried to clear up the error with Whinfield. Instead, CDI inserted accord

and satisfaction language into its tender of Whinfield's commission check that, if Whinfield had

endorsed the check, would have caused him to waive any claim to an override commission." (*Id.*)

Further, Whinfield argues that CDI acted in bad faith, arbitrarily, and unreasonably when it

"originally tendered the proper retail commission on February 7, 2015," to Whinfield, and then

returned the money to Leaders, which then took its additional 10% "haircut." (Pl.'s Amend.

Prop. Find. at 10.)

      Based on the evidence presented, the Court does not find that CDI acted in bad faith,

arbitrarily, or unreasonably, and therefore declines to award Whinfield double damages or

attorneys' fees. CDI presented credible evidence that personal production was not contemplated

as part of CDI's business, that CDI "stumbled into" it and had not developed policies to address

27

it, and that there was confusion among the SVPs about how personal production would be compensated. (Mohr Test.) Further, the Lenoci Sr. Case was the first retail case CDI had handled involving a variable product, which led to additional uncertainty affecting the base commission: CDI's failure to pay Whinfield the 10% of total commission on the Lenoci Sr. Case that Leaders deducted when the transaction was reversed can be explained by confusion about how to handle what was, at the time, a novel transaction for CDI. (*See* Nassiri Tr. 236:1 – 236:5 ("It was only after this transaction took place that we found out from Leaders that the haircut for personal production . . . is 15 percent, not 5 percent.").) This confusion manifested itself in the apparent belief by everyone involved—Deutsch, Nassiri, Whinfield, Maholchic, Wickersham, and employees at Leaders—that CDI could lawfully pay the compensation on the Lenoci Sr. Case, a variable product. This atmosphere of confusion and uncertainty does not support a finding of bad faith, arbitrariness, or unreasonableness. In *Sansone v. Clifford*, 219 Conn. 217 (1991), the Connecticut Supreme Court affirmed a trial court's determination that a defendant's failure to make payment to an employee was not "unreasonable or done in bad faith," when the events "took place in an atmosphere of uncertainty as to the plaintiff's rights," *Sansone v. Clifford*, No. CV88 02 54 92S, 1990 WL 283902, at *11 (Conn. Super. Ct. July 13, 1990), and the plaintiff "had not proved that [the defendant's] failure to make payment was unreasonable or done in bad faith." *Sansone v. Clifford*, 219 Conn. at 229. Further, Mohr testified credibly that CDI has paid 85% of target premium with no overrides in every personal production case the company has ever handled, and its insistence on compensating Whinfield that way was an attempt to treat him the same as other SVPs; this does not suggest bad faith either.

Finally, CDI's insertion of what amounted to terms of accord and satisfaction into the check sent on February 7, 2012, was not in bad faith. It is common commercial practice to use

such language when there is a good faith dispute about the existence of an amount owed. *Ass'n Res., Inc. v. Wall*, 298 Conn. 145, 187 (2010) ("When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim.") Even Whinfield acknowledged that his relationship with CDI had become "rocky" by February 2012—when the check with the "full payment" language was issued—due to the ongoing dispute about compensation. (Whinfield Test.) It was not unreasonable for CDI to insert such language in order to avoid litigation and, specifically, the possibility that Whinfield might choose to keep the amount tendered and nonetheless sue for the remainder that he thought he was owed.

Based on all the evidence presented, the Court cannot find that CDI acted in bad faith, arbitrarily, or unreasonably.

## III.    CONCLUSION

On the basis of all of the evidence and the arguments of the parties, the Court finds in Plaintiff's favor on the breach of the SVP agreement and the breach of an express agreement as to base commissions, but finds that CDI should be entitled to deduct processing fees in calculating the override commissions. The Court does not find a basis for double damages and/or attorneys' fees under Conn. Gen. Stat. § 31-72. Therefore, the Court enters judgment in favor of the Plaintiff in the amount of $100,901.65.

IT IS SO ORDERED.

Dated: June 3, 2015
Hartford, Connecticut

_____/s/_____
Michael P. Shea, U.S.D.J.